

duanecalvo.mem

LEONARDO M. RAPADAS
United States Attorney
KARON V. JOHNSON
Assistant U.S. Attorney
Suite 500, Sirena Plaza
108 Hernan Cortez Avenue
Hagatna, Guam 96910
TEL: (671) 472-7332
FAX: (671) 472-7334

**FILED**
DISTRICT COURT OF GUAM

NOV 0 9 2007 *nbo*

JEANNE G. QUINATA
Clerk of Court

Attorneys for the United States of America

## IN THE UNITED STATES DISTRICT COURT

## FOR THE TERRITORY OF GUAM

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CRIMINAL CASE NO. 05-00016 |
| | ) | |
| Plaintiff, | ) | |
| | ) | **UNITED STATES MEMORANDUM** |
| vs. | ) | **CONCERNING NEED FOR** |
| | ) | **EVIDENTIARY HEARING** |
| DUANE ANTHONY CALVO, | ) | |
| | ) | |
| Defendant. | ) | |
| ———————————————— | ) | |

This matter comes before the court for resentencing.  Defendant was initially sentenced by the Honorable Larry A. Burns, on February 8, 2006.  During the sentencing, the court questioned whether the two kilograms to which defendant had pled guilty was an accurate reflection of the scope of his criminal activity.  A copy of that part of the sentencing transcript is attached hereto as Exhibit 1.  It reflects the problem which arose when the government indicated

1

it could call Kimmie Dang, the informant who had offered the two kilos to defendant originally, to testify about his activities as one of her distributors. At that point, defense counsel Curtis Van de Veld revealed that he also represented Ms. Dang. The court tried to avoid the conflict by eliciting an agreement that defendant had dealt more than 50 grams. On appeal, however, the Ninth Circuit held it was a clear and prejudicial conflict for Mr. Van de Veld to attempt to represent both Dang and the defendant, and remanded the case for resentencing.

The problem, which had not been anticipated by either counsel, arose because the sentencing court wanted testimony on defendant's past dealings with Dang. This Court has not indicated whether it shares the same concerns as did Judge Burns. Nevertheless, the government will have Ms. Dang present, should the court wish to examine her. In addition, the government will be introducing a redacted report of statements made by the defendant to DEA Special Agents Jon Anderson and Paul Griffith, which is attached hereto as Exhibit 2. Both agents have left island, so the evidence will be introduced by another agent who has reviewed the file.

Respectfully submitted this __9th__ day of November, 2007.

LEONARDO M. RAPADAS
United States Attorney
Districts of Guam and NMI

By: _____
KARON V. JOHNSON
Assistant U.S. Attorney

2

1 Court, I talked to the Assistant Attorney General Monte

2 May yesterday. The defendant was released from custody

3 prior to being indicted, and apparently has fled the

4 island; they have a warrant out for her arrest. She's

5 been indicted, warrant outstanding, and that's the end

6 of it at this point.

7       THE COURT: That case was brought in state

8 court?

9       MS. JOHNSON: It was brought in the Superior

10 Court by the local attorney general.

11       THE COURT: Okay.

12       MR. VAN DE VELD: Thank you, Your Honor.

13       Your Honor, my client is of course going to

14 speak to the court about his circumstances on his own,

15 but I'd like to discuss some of the circumstances here.

16 This is my client's second offense of a drug nature.

17 And the law generally presumes that the penalty that is

18 imposed should twice of what it was that was available

19 to punish the defendant under an original case. In his

20 original case he was sentenced to 30 months.

21       The reason for the guideline level in this

22 particular case being as high as it is, is because of

23 the amount of drug involved. As the Court is well

24 aware, under the Sentencing Guidelines we determine the

25 level of the offense based upon the quantity of the

1    amount involved.

2    And if Your Honor looks at the facts and

3    circumstances of this case, in this particular case,

4    the circumstances are that Mr. Calvo was essentially

5    going to be fronted two kilograms of ice, initially for

6    the payment of $5,000 as a down payment. There's

7    nothing that indicates in the presentence report that

8    this was an amount that Mr. Calvo was looking for, and

9    does not appear to be consistent with amounts that had

10   previously -- that he had previously been involved

11   with.

12   THE COURT: Where did the first mention of the

13   amount come from; did it come from Mr. Calvo or did it

14   come from the informant?

15   MR. VAN DE VELD: My understanding is it came

16   from the informant.

17   THE COURT: You agree with that, Ms. Johnson?

18   MS. JOHNSON: No, Your Honor. We always try

19   to get money up front. She called -- she had been

20   dealing with the defendant for years when he worked

21   with the Guam Water Authority in kilo amounts. She had

22   called him now that she was convicted, of course, and

23   working undercover for DEA, called and said "I've got

24   two kilos, I will front it to you but I want cash up

25   front". He tried to get the cash, was unable to, and

1  so she said, "all right, I'll give it to you without

2  cash up front". But initially, we wanted cash, and he

3  was not able to come up with it.

4          THE COURT: But the amount, the first mention

5  of two kilos, that was from the informant rather than

6  from Mr. Calvo?

7          MS. JOHNSON: The informant said "I've got two

8  kilos, do you want to move it for me?"

9          THE COURT: Now, you represent that she had

10 previous dealings with him?

11         MS. JOHNSON: Yes, Your Honor. That's why we

12 were able to identify him. Her name is Kimmie Dang;

13 she and her boyfriend, I should say several boyfriends,

14 were arrested in November of 2003. They were moving

15 kilos of ice. When she plead guilty and she agreed to

16 cooperate with us, she identified one of her major

17 distributors as Mr. Calvo, who at that time was working

18 for the Guam Water Authority. She said that he would

19 call, ask for more product, they call it, she would

20 deliver up to a kilo at a time to the Water -- to the

21 parking lot of the Water Authority, and he would pay

22 her then, take the kilo, distribute it, and then ask

23 for more.

24         THE COURT: Was there ever an instance that

25 she recounted where he took delivery of more than a

1 kilo?

2       MS. JOHNSON: I think at one time she might

3 have delivered 1.5, but I'm not certain about that.

4 It's been several years since I've reviewed the

5 deliveries that she made to him.

6       THE COURT: Here's the part of it that I'm

7 uncomfortable with, and it's been a source, I think,

8 of discomfort historically, when the penalty is based

9 on the amount. And here we don't have an actual

10 transaction of methamphetamine, we have look-alike

11 methamphetamine. And the amount originates with law

12 enforcement. I mean, what's to say they couldn't have

13 said, we've got five kilos, and if he was willing --

14 and, you know, there's no question in this case as I

15 look at this, he was willing, this isn't a case where

16 he was entrapped, he doesn't claim entrapment. But it

17 just seems to me that there's a certain arbitrariness

18 when the amount of the drug dictates the penalty, and

19 the amount originates with law enforcement.

20       I'm not accusing anybody of any wrongdoing,

21 I'm just saying that it seems to me somewhat arbitrary

22 to say you're subject now to 20-year mandatory minimum

23 because the authorities decided that they would sell

24 you two kilos, or tell you that they had two kilos for

25 sale rather than one kilo.

1    MS. JOHNSON:  In this case it is not, Your

2  Honor.  In essence it was a test.  She had other

3  distributors distributing less for her, for example,

4  a hundred grams at a time, and she identified those

5  people for us.  But she said Mr. Calvo could move

6  kilos, and we wanted to test that.  A kilo is a lot.

7    THE COURT:  But what am I to make of the fact

8  that he couldn't come up with the money, and he was

9  never offered the opportunity to buy a lesser amount?

10   I mean in ordinary exchanges, whether it's

11 drugs or something else, if you can't afford two kilos,

12 you say, well, maybe I'll take one kilo.  And that

13 opportunity was never offered.  Had that been offered

14 and had he paid for that amount, then I'd have no

15 problem saying, all right, you got yourself into this,

16 you knew exactly what you were doing.  But here we

17 didn't have a consummated transaction.  As I understand

18 it, he got to the room, told the informant that he

19 couldn't come up with the money, and there was some

20 other conversation; at that point he was arrested.

21   No question he was willing.  The question I

22 have is that he was unable at that point, and wasn't

23 given the alternative to maybe take a lesser amount.

24 And had he done so, had that alternative been given,

25 then he wouldn't be facing the huge sentence that he

1  faces today.  That's the part that is, seems to me a

2  little bit subjective and arbitrary.

3          And again, I'm not suggesting that anyone did

4  anything wrong, anybody had untoward motives.  I'm just

5  suggesting that this is -- I'm not comfortable with the

6  arbitrariness of how a penalty attaches because someone

7  decides this is the amount we're going to offer for

8  sale.

9          MS. JOHNSON:  What I'm trying to say in this

10  case is that it's not arbitrary.  She said he was her

11  major distributor, that he was moving kilos for her.

12  And that reflects a certain organization and a certain

13  ability to move that amount.  And part of it, as I say,

14  was a test to see whether or not he actually thought he

15  could move two kilos; and the answer is yes, he thought

16  he could, because he had done it before.

17          THE COURT:  What would the penalty be had the

18  agents said, we have one kilo for sale, or one kilo for

19  distribution?

20          MS. JOHNSON:  Well, in effect, no difference.

21  He is looking, because he has a prior drug conviction,

22  at a mandatory 20-year sentence, 240 months.

23          THE COURT:  So even if it had been a single

24  kilo, you say the penalty scheme would be the same?

25          MS. JOHNSON:  He would be looking at a

1　mandatory 20-year sentence.

2　　　　　THE COURT:  Okay.

3　　　　　MR. VAN DE VELD:  But not under the

4　guidelines.  Under the guidelines, instead of it being

5　a level 38 base offense, it would have been a level 36

6　base offense, it would have been a two-level --

7　　　　　MS. JOHNSON:  What I'm saying is -- I'm sorry.

8　　　　　MR. VAN DE VELD:  Excuse me -- it would have

9　been a two-level difference in the base offense level.

10　And while the guidelines are not mandatory, and because

11　of *Booker Fanfan* decision, they still must be taken

12　into consideration.  And once the motion for downward

13　departure is made, then the Court really is free to

14　look at those sentencing guidelines.  And in looking

15　at those sentencing guidelines and applying them, this

16　would have been a level 36 offense rather than a level

17　38 offense.  So it does affect the sentencing

18　considerations, contrary to what the government says.

19　　　　　MS. JOHNSON:  Well, actually it does affect

20　them in this sense, Your Honor:  That he should

21　receive, and he deserves to receive 240 months.

22　Because he has tried to cooperate and did provide one

23　drug dealer to the local authorities, we think that a

24　five-year reduction from that amount is appropriate.

25　We do not think a further reduction is appropriate

1  given the history of him and the amount of ice that he

2  has been moving.  So we stand by our 180 months.

3  THE COURT:  Ms. Johnson, how many instances

4  did the informant relate, prior to this aborted

5  transaction, where she had -- what did she tell you,

6  how many times did she deliver kilo quantities to

7  Mr. Calvo?

8  MS. JOHNSON:  For the last two years before

9  her arrest, since 2001, he had been their major

10  distributor.

11  THE COURT:  But I need some flesh on the

12  bones; what does that mean?  How many --

13  MS. JOHNSON:  Pardon me?

14  THE COURT:  I said I need some flesh on the

15  bone.  Would you say, think back, give me a ballpark

16  figure of how many times she delivered kilo quantities

17  to him and he paid for them.

18  MS. JOHNSON:  She estimated that she was

19  dealing with him between three and four kilos a year

20  minimum.

21  MR. VAN DE VELD:  Your Honor --

22  MS. JOHNSON:  If I may finish.  She did not

23  keep accurate drug records.  The first thing we look to

24  do is to see if we have pay-and-owe sheets, and we

25  didn't.  So that was her recollection, and also the

1  recollection of the people who delivered with her.

2  THE COURT:  All right.  Thank you.

3  Go ahead, Mr. Van de Veld.

4  MR. VAN DE VELD:  Your Honor, only because of

5  the fact that I'm familiar with the cooperating witness

6  who led to the arrest of the defendant am I privy of

7  the information that government counsel has spoken

8  about.  I don't think it accurately portrays the

9  information that was provided, which is that Mr. Calvo

10  was one of four people who were regular distributors,

11  according to that confidential informant for that

12  organization.  That organization moved kilos of ice.

13  I don't recall her saying that at any one time

14  she had given an amount of a kilo or more to Mr. Calvo.

15  I do recall her saying that, that she had given large

16  quantities to him and that he had moved them, and sold

17  them.  But I don't recall anything as far as --

18  certainly nothing that she mentioned about a kilo and a

19  half or two kilos.  And so --

20  THE COURT:  What about the -- Ms. Johnson said

21  that when pressed, the informant said, hmm, I think

22  maybe three to four kilos a year.  Was that figure,

23  that three to four peculiar to Mr. Calvo, or to a group

24  of people?

25  MS. JOHNSON:  Oh, to Mr. Calvo.  But I

1  suggest, if this is an important point, then I suggest

2  we have an evidentiary hearing and we call Kimmie Dang

3  to the stand; she was the one making the deliveries to

4  him.  And then we'll have it out of the horse's mouth.

5  　　　　THE COURT:  Well, if you dispute that --

6  　　　　MR. VAN DE VELD:  I do dispute it.

7  　　　　THE COURT:  Maybe we should have her here.

8  How long would it take to get her here, Ms. Johnson?

9  　　　　MS. JOHNSON:  I don't know, Your Honor.

10 　　　　THE COURT:  Is she still on Guam?

11 　　　　MS. JOHNSON:  To my knowledge, she's still on

12 island.  That case is being handled by another AUSA, so

13 I do not know immediately where she is.  I'd have to

14 call DEA.

15 　　　　MR. VAN DE VELD:  She is my client, Your

16 Honor.  She is here on Guam.  She is --

17 　　　　THE COURT:  What are we going to do about that

18 then?

19 　　　　MR. VAN DE VELD:  I met with her yesterday.

20 　　　　THE COURT:  What are we going to do about

21 that?  I mean, if she's your client, you can hardly be

22 in an adversarial position to her, which you would be.

23 You dispute what Ms. Johnson attributes to her.

24 　　　　MR. VAN DE VELD:  That's correct.

25 　　　　THE COURT:  So what's your suggestion?  It

1    seems to me you can't represent both, and having

2    represented her previously, you're hardly in a position

3    to take an adversarial position in this case.

4          MR. VAN DE VELD:  I actually think that the

5    information can be provided from the records of DEA and

6    doesn't necessarily have to come from Ms. Dang.

7          THE COURT:  Did she --

8          MR. VAN DE VELD:  I was present, Your Honor,

9    when she was --

10         THE COURT:  Would you be satisfied with that?

11         MR. VAN DE VELD:  I believe so.  Your Honor,

12   I was present when she was interviewed on three

13   occasions, and in detail.  The first time the interview

14   was conducted over a two-day period, her initial

15   interview, and it was extensive, and full and complete

16   information was provided.

17         THE COURT:  Ms. Johnson, is the agent here who

18   debriefed the informant?  Is that person still on Guam?

19         MS. JOHNSON:  No, he is not, Your Honor.  And

20   I would need to find the agent and I would need to find

21   her, frankly.  I think if we're going to have a

22   contest, then there won't be any question as to what

23   she told the DEA, whether there was a misunderstanding.

24   I think she should be called to the stand.

25         THE COURT:  Tell me this.  And maybe I'm

1    making a hard one out of an easy one with trying to be

2    too specific with the amounts.

3            What amount is the trigger for the 20-year

4    mandatory minimum, if one has a serious drug prior?

5            MS. JOHNSON:  More than 50 grams.

6            THE COURT:  Is there any question in your

7    mind that the informant told the agent, the DEA agent,

8    Mr. Van de Veld, that she had on several occasions

9    delivered more than 50 grams to Mr. Calvo?

10           MR. VAN DE VELD:  No, Your Honor.

11           THE COURT:  Okay, then I don't think we need

12   to have the hearing.

13           The concern I had, of course, was with the

14   arbitrariness of suggesting an amount that becomes

15   a trigger for a high mandatory minimum.  But

16   understanding now that the trigger is quite low, and

17   you don't dispute that the -- I know you're not

18   necessarily agreeing with the assertions of the

19   informant, but if you don't disagree that at least

20   that's what she told the DEA, that she had had multiple

21   liaisons with Mr. Calvo, and that they involved a drug

22   amount of at least 50 grams or more, then seems to me

23   that answers the question that I had.

24           MR. VAN DE VELD:  Well, it may answer the

25   question that you had regarding the mandatory minimum,

1  but I think it does impact the sentencing guidelines.

2  And I would continue to argue --

3          THE COURT:  Okay.  And I agree with your

4  observations concerning the guidelines.  I think

5  they're still an important part of the sentencing

6  matrix; two of the seven factors under 3553 are

7  expressly guideline factors.  The sentencing range

8  provided for by the guidelines and pertinent policy

9  statements of the sentencing commission, the other

10  five factors are subsumed within the guidelines, so --

11  and I think when one looks at the decision in *Booker*,

12  particularly the remedial part of the decision, there's

13  little question that the guidelines were intended to

14  significantly continue to inform the federal sentencing

15  process, they're not just not mandatory.  So I

16  understand your argument by analogy that if we are

17  talking about a lesser amount, then the starting point

18  is not 38, it's 36.

19          MR. VAN DE VELD:  Yes, Your Honor.

20          THE COURT:  Then I hope you agree, I don't

21  think we need an evidentiary hearing on this point.

22  It's a point that I raised, and it's been answered to

23  my satisfaction.  So --

24          MR. VAN DE VELD:  And the amount of greater

25  than 50 grams is consistent with what my recollections

## REPORT OF INVESTIGATION

Page 1 of 6

| 1. Program Code | 2. Cross File    Related Files | 3. File No. RB-05-0011 | 4. G-DEP Identifier WGA3I |
|---|---|---|---|
| 5. By: S/A Jon Anderson   At: Guam Resident Office | ☒ RB-01-0039   ☒ RB-03-0002   ☐   ☐   ☐ | 6. File Title  CALVO, Duane | |
| 7. ☐ Closed ☐ Requested Action Completed   ☐ Action Requested By: | | 8. Date Prepared 02/28/05 | |

9. Other Officers:
   RAC Jeffrey A. Silk and S/A Paul S. Griffith.

10. Report Re:   POST ARREST INTERVIEW OF DUANE A. CALVO
    AND THE SIEZURE OF NON-DRUG EXHIBIT N-6 ON 02/18/2005.


## SYNOPSIS

On February 18, 2005, agents from the DEA GRO initiated a "Reverse Delivery" of "Look Alike Ice" to Duane A. CALVO, Raymond G.L. CALVO and John T. SANTOS.  The three subjects were arrested at the Holiday Inn Hotel in Tumon, Guam by agents from the DEA GRO.  D.A. CALVO was interviewed at the DEA GRO after his arrest was effectuated.  All three subjects were released on personal recognizance after their arrest and interviews with the agents.


## DETAILS

1.   Reference is made to DEA-6 ROI "A/Surveillance, arrest of Duane CALVO, Raymond CALVO and John SANTOS, acq. Of Ex 1, Ex N-1 and N-2", dated 02-22-2005, by S/A Paul S. Griffith.

2.   On February 18, 2005, at approximately 11:20 a.m., agents from the DEA GRO arrested three subjects identified as Duane A. CALVO, Raymond G.L. CALVO and John T. SANTOS for attempted possession of purported crystal methamphetamine (a.k.a. "ice").  The subjects were transported to the DEA GRO for interview and processing.

3.   At approximately 12:20 p.m., S/A Jon Anderson interviewed D.A. CALVO at the DEA GRO.  D.A. CALVO read aloud to S/A's Jon Anderson and S/A Paul S. Griffith his Miranda Warnings.  D.A. CALVO asked for an attorney to be present during questioning by the agents.  S/A Griffith contacted the U.S.

| 11. Distribution: Division LAFD | 12. Signature (Agent)   S/A Jon Anderson | 13. Date 03/03/2005 |
|---|---|---|
| District | 14. Approved (Name and Title)   RAC Jeffrey A. Silk | 15. Date 03/03/2005 |
| Other   SARI/NN | | |

DEA Form    - 6
(Jul. 1996)

### DEA SENSITIVE
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

EXHIBIT 2

| **REPORT OF INVESTIGATION** *(Continuation)* | 1. File No.<br>RB-05-0011 | 2. G-DEP Identifier<br>WGA3I |
|---|---|---|
| 4.<br>Page 2 of 6 | 3. File Title<br>CALVO, Duane | |
| 5. Program Code | 6. Date Prepared<br>02/28/05 | |

Federal Public Defender's Office and requested for FPD Attorney Richard Arens to be present during D.A. CALVO's questioning.

4.  At approximately 1:23 p.m., FPD Arens appeared at the DEA GRO and met with D.A. CALVO.

5.  At approximately 2:19 p.m., FPD completed his interview with D.A. CALVO and allowed agents to interview him concerning his activities which led to his arrest and other drug trafficking activities he was aware of.

6.  The following are bullet excerpts from his post arrest interview:

• He told the agents that the he, SANTOS and R. CALVO were intending to receive what they believed to be "ice" from CS-04-116472 (hereafter referred to as CS) at the Holiday Inn Hotel before they were arrested. He wanted to sell the "ice" mainly to Luis CRUZ and anyone else who had money available. SANTOS and R. CALVO were aware of the intended meet with the CS and what the meeting was for.

• In the past few years, he used to supply as much as $30,000.00 to $40,000.00 worth of "ice" to Melvin WARNER a day. WARNER is currently in prison.

• He used to supply Vince Luis Hocog CRUZ with at least one kilogram at any one time and received approximately $300,000.00 to $400,000.00 in cash.

• He sold "ice" in large quantities to L. HOCOG and Laddie HUBBARD.

• He told agents that he has heard the largest "ice" distributor on Guam at the present time is a person he knows only as "Bong".

• He has known CHAN Kong kwok (a.k.a. "Ken" CHAN) since 1996. He first met CHAN at the Department of Motor Vehicles Division while they were registering their personal vehicles.

• He told agents that he hid large sums of "ice" profits in three different areas. He said $98,000.00 was stolen after he hid it in a

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

| REPORT OF INVESTIGATION *(Continuation)* | 1. File No. RB-05-0011 | 2. G-DEP Identifier WGA3I |
|---|---|---|
| | 3. File Title CALVO, Duane | |
| 4. Page 3 of 6 | | |
| 5. Program Code | 6. Date Prepared 02/28/05 | |

bonnie are across his residence that paralleled the Cross Island Road (Route 17). $30,000.00 was stolen from inside a parked Corvette at the residence of John T. SANTOS. $50,000.00 was stolen from the rooftop of his residence. He stated he does not know who stole the "ice" profits and could only assume it was probably his neighbor who are of Chuukese origin or his friend named Rodney CEPEDA.

• He told the agents that CEPEDA and WARNER still owe him approximately $60,000 to $80,000.00 from the sale of "ice" to them.