1  **LUJAN AGUIGUI & PEREZ** LLP
   DNA Building, Suite 300
2  238 Archbishop Flores Street
   Hagåtña, Guam 96910
3  Telephone: (671) 477-8064
   Facsimile: (671) 477-5297
4
5  *Attorneys for Defendant Duane Anthony Calvo*



**FILED**
DISTRICT COURT OF GUAM

FEB 2 7 2008 

**JEANNE G. QUINATA**
**Clerk of Court**

6
7              **IN THE UNITED STATES DISTRICT COURT**
8                      **DISTRICT OF GUAM**
9

| | |
|---|---|
| UNITED STATES OF AMERICA, | CRIMINAL CASE NO. CR05-00016 |
| Plaintiff, | **MOTION FOR LEAVE TO FILE SUPPLEMENTAL RESPONSE TO COURT'S FEBRUARY 13, 2008 ORDER AND THE GOVERNMENT'S MEMORANDUM CONCERNING DEFENDANT'S GUILTY PLEA** |
| -vs- | |
| DUANE ANTHONY CALVO, | |
| Defendant. | |

Defendant, DUANE ANTHONY CALVO, by and through counsel, LUJAN AGUIGUI & PEREZ LLP, respectfully requests leave to file the attached supplemental response. This request is made to enable the Defendant to address the standards and burdens applicable to issues including determining drug quantity, which have been raised by the Government in various filings, including the Government's February 26, 2008 filing. Should the Court grant the requested leave, the Defendant understands that the Government may wish to file a supplemental brief.

Dated this 27th day of February, 2008.

                              **LUJAN AGUIGUI & PEREZ** LLP

              By: _____
                              **PETER C. PEREZ, ESQ.**
                              *Attorneys for Defendant Duane Anthony Calvo*

C-0077/661-00/0661/PCP/dmg

**LUJAN AGUIGUI & PEREZ LLP**
DNA Building, Suite 300
238 Archbishop Flores Street
Hagåtña, Guam 96910
Telephone: (671) 477-8064
Facsimile: (671) 477-5297

*Attorneys for Defendant Duane Anthony Calvo*

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA, | CRIMINAL CASE NO. CR05-00016 |
| Plaintiff, | |
| -vs- | **DEFENDANT'S SUPPLEMENTAL RESPONSE TO COURT'S FEBRUARY 13, 2008 ORDER AND THE GOVERNMENT'S MEMORANDUM CONCERNING DEFENDANT'S GUILTY PLEA** |
| DUANE ANTHONY CALVO, | |
| Defendant. | |

Provided this Court grants the Defendant leave to supplement his earlier filed response to this Court's February 13, 2008 Order, Defendant supplements his response as follows:

### I. The Defendant does not request withdrawal of his guilty plea.

The Defendant does not request withdrawal of his guilty plea. However, he asserts that drug quantity is an issue which must be resolved at the sentencing hearing. The Defendant pled guilty without the benefit of a plea agreement to the indicted charge, Attempted Possession with Intent to Distribute Methamphetamine Hydrochloride, in violation of 21 U.S.C. 841(a)(1), (b)(1)(A)(viii), and 846. The Indictment charged the Defendant with "...unlawfully and knowingly attempt[ing] to possess with intent to distribute *approximately* two kilos net weight of methamphetamine hydrochloride..." The Indictment failed to establish a specific drug quantity

or purity. Even the Defendant's Counsel's statements at the change of plea hearing failed to establish a drug quantity higher than 50 grams. At the change of plea hearing the Government stated: "...the stipulation must include the fact that the quantity was two kilos..." The Defendant's Counsel stated "That's fine, Your Honor..." (Change of Plea transcript, 12:20-21, 23). The minimum applicable drug quantity under this statute is 50 grams or more of methamphetamine. This is the drug quantity which must be attributed to the Defendant at sentencing absent evidentiary proof by the Government. Under the sentencing guidelines, the base offense level for 50 grams of methamphetamine is 32. U.S.S.G. 2D1.1.

The Defendant pled guilty to the indictment and the specific elements and facts contained therein. This is does not mean that the Defendant must vacate his guilty plea and go to trial. Nor can the Government demand he do so. Instead, the Government must present evidence at the sentencing hearing to support its claims concerning the appropriate drug quantity

**II.    The drug quantity issue requires an evidentiary hearing.**

Because a drug quantity above 50 grams has never been established by the Government, this is the drug quantity which must be attributed to the Defendant unless the Government provides sufficient proof of a higher amount. The Indictment does not specify a precise drug quantity; only an approximate quantity. When the Defendant pled guilty to the Indictment, he pled to an approximate quantity of a drug with an unstated purity. Consequently, the burden of proving drug quantity is on the Government.

This is not a novel issue. The original sentencing Court expressed concern about arbitrarily attributing a two kilogram drug quantity to the Defendant in this case. At the sentencing hearing the Court itself noted the following: (1) there is no actual transaction of

*United States of America v. Duane Anthony Calvo;*
District Court Criminal Case No. CR05-00016
**Defendant's Supplemental Responses to Court's February 13, 2008**
**Order and the Government's Memorandum Concerning Defendant's**
**Guilty Plea**

methamphetamine but instead *look alike* methamphetamine (Sentencing Transcript, ST23: 6-19); (2) there was no consummated drug transaction (ST24: 16-17); (3) that the drug quantity [of two kilograms being attributed to the Defendant] seemed *subjective* and *arbitrary* (ST25: 1-8); (4) it just seems that there's a certain *arbitrariness* when the amount of the drug dictates the penalty, and the amount originates with law enforcement (ST23: 16-19).

The sentencing Court itself seemed to express that the appropriate quantity to attribute to the Defendant was 50 grams when it noted the following. When asked by the sentencing Court whether there was any question in his mind that Dang told the DEA that she had on several occasions delivered more than 50 grams to Calvo, Van de Veld, Calvo's sentencing counsel responded, "No, Your Honor." (ST31:6-10). The sentencing Court continued, "but if you [Van de Veld] don't disagree that she had multiple liaisons with Mr. Calvo, and that they involved a drug quantity of 50 grams or more, then seems to me that answers the question that I had." (ST31: 19-23). The sentencing Court continued further, "Then I hope you [Van de Veld] agree, I don't think we need an evidentiary hearing at this point," to which Van de Veld responded, "And the amount of 50 grams is consistent with what my recollections are of Ms. Dang…had testified, or had provided information to the government concerning the activities." (ST32: 20-35:5).

At the original sentencing hearing, the Government itself was unable to even argue accurately the information purportedly obtained by Dang concerning the drug quantity which should be attributed to Calvo. The Government stated, "I think at one time [Dang] might have delivered 1.5, but I'm not certain about that. It's been several years since I've reviewed the deliveries made to him. (ST23: 2-5). The Government further stated that, "[Dang] did not keep

*United States of America v. Duane Anthony Calvo;*
District Court Criminal Case No. CR05-00016
**Defendant's Supplemental Responses to Court's February 13, 2008**
**Order and the Government's Memorandum Concerning Defendant's**
**Guilty Plea**

accurate drug records. The first thing we do is see if we have pay-and-owe sheets, and we didn't." (ST27: 22-25).

However, this issue does not entitle the Government to a jury trial on the issue as it claims. In determining drug quantity at the sentencing hearing the Court must have an adequate basis for setting the drug quantity and must specify its basis when the facts are in conflict. *U.S. v. Miele*, 989 F.2d 659 (3d Cir. 1993), *U.S. v. Beler*, 20 F.3d (7th Cir. 1994). The government bears the burden of establishing quantity of drugs for purposes of calculating the Defendant's base offense level. The government must show by sufficient evidence that a particular drug and quantity is involved. *U.S. v. Williams*, 982 F.2d 1209 (8th Cir. 1992).

The drug quantity amount stated in the indictment is an *approximate* amount. Under the sentencing guidelines, "[w]here there is no drug seizure or the amount seized does not reflect the scale of the offense," a district court may estimate the quantity of the drug. U.S.S.G. 2D1.1, Note 12. *U.S. v. Putney*, 906 F.2d 477, 479 (9th Cir. 1990). "Approximations of drug quantity must meet there criteria." *U.S. v. Kilby*, 443 F.3d 1135, 1141 (9th Cir. 2006). "First, …the government is required to prove the approximate quantity by a preponderance of the evidence…Second, …the information which supports an approximation must possess sufficient indicia of reliability to support its probable accuracy. Third, …the district court must err on the side of caution in calculating approximated drug quantity." *U.S. v. Chase*, 499 F.3d 1061, 1068 (9th Cir. 2007).

U.S.S.G 2D1.1 Note 12 further provides, "…*If…the Defendant establishes that the defendant did not intend to provide or purchase, or was not reasonably capable of providing or purchasing, the agreed-upon quantity of the controlled substance, the **court shall exclude from***

---

Page 4 of 5

*United States of America v. Duane Anthony Calvo;*
District Court Criminal Case No. CR05-00016
**Defendant's Supplemental Responses to Court's February 13, 2008**
**Order and the Government's Memorandum Concerning Defendant's**
**Guilty Plea**

*the offense level determination the amount controlled substance that the Defendant establishes that the defendant…was not reasonably capable of providing or purchasing.*"

In the instant case, it cannot be disputed that the drug quantity at issue is an approximate amount. Additionally, the Government has adopted the facts contained in the PSR which specifically establish that Calvo was not capable of purchasing a two kilogram quantity of methamphetamine. Consequently, the Government bears the burden of proving the drug quantity in this case and is not entitled to a jury trial in attempting to do so.

**III.    Other Issues Require an Evidentiary Sentencing Hearing**

The issues of sentencing entrapment, cooperation credit, and other sentencing issues require the presentation of evidence.

Dated this 27th day of February, 2008.

**LUJAN AGUIGUI & PEREZ** LLP

By: _____

**PETER C. PEREZ, ESQ.**
*Attorneys for Defendant Duane Anthony Calvo*

C-0077/661-00/0661/PCP/dmg

---

*United States of America v. Duane Anthony Calvo;*
District Court Criminal Case No. CR05-00016
**Defendant's Supplemental Responses to Court's February 13, 2008**
**Order and the Government's Memorandum Concerning Defendant's**
**Guilty Plea**

# IN THE DISTRICT COURT OF GUAM

## TERRITORY OF GUAM

\* \* \*

**FILED**

**DISTRICT COURT OF GUAM**

**MAR 3 0 2006**

**MARY L.M. MORAN**
**CLERK OF COURT**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | COURT OF APPEALS |
| ) | CASE NO. 06- |
| Plaintiff, ) | |
| ) | |
| vs. ) | CRIMINAL CASE |
| ) | NO. CR05-00016 |
| DUANE ANTHONY CALVO, ) | |
| ) | |
| Defendant. ) | |
| _____) | |

### TRANSCRIPT OF PROCEEDINGS

BEFORE

THE HONORABLE LARRY ALAN BURNS

Designated District Judge

**SENTENCING HEARING**

**WEDNESDAY, FEBRUARY 8, 2006**

1  **APPEARANCES:**

2

3  FOR THE PLAINTIFF:          UNITED STATES ATTORNEY'S OFFICE
                               BY:  KARON V. JOHNSON, Esq.
4                              ASSISTANT UNITED STATES ATTORNEY
                               Suite 500, Sirena Plaza
5                              108 Hernan Cortez Avenue
                               Hagatna, Guam  96910
6

7  FOR THE DEFENDANT:          LAW OFFICES OF VAN DE VELD,
                               SHIMIZU, CANTO & FISHER
8                              BY:  CURTIS VAN DE VELD, Esq.
                               167 East Marine Corps Drive
9                              Hagatna, Guam  96910

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    HAGATNA, GUAM; WEDNESDAY, FEBRUARY 8, 2006; 9:34 A.M.

2                          * * *

3         THE CLERK:  Criminal case 05-00016, United

4    States of America versus Duane Anthony Calvo,

5    sentencing.

6         Counsel, please state your appearances.

7         MS. JOHNSON:  Good morning, Your Honor, Karon

8    Johnson for the United States.

9         THE COURT:  Good morning, Ms. Johnson.

10        MR. VAN DE VELD:  Good morning, Your Honor,

11   Curtis Van de Veld on behalf of the defendant, Duane

12   Calvo, who's to my immediate right.

13        THE COURT:  All right, good morning.

14        The matter is on for sentencing this morning.

15   Is there any reason why judgment should not be

16   pronounced at this time Mr. Van de Veld?

17        MR. VAN DE VELD:  No, Your Honor.

18        THE COURT:  All right.  In connection with

19   sentencing this morning, the court has reviewed the

20   presentence report.  I've reviewed the sentencing

21   recommendation of the probation officer, as well as

22   the motion filed by the government pursuant to 5K.

23   The court has also reviewed exhibits submitted by and

24   on behalf of Mr. Calvo today, including a number of

25   letters which I read this morning supporting Mr. Calvo.

1    Are there any other documents the court should

2 have considered in connection with sentencing?

3    MR. VAN DE VELD:  No, Your Honor.

4    THE COURT:  From the government, anything

5 else?

6    MS. JOHNSON:  Nothing, thank you, Your Honor.

7    THE COURT:  I noticed -- I have one question

8 before we begin.  The government's motion -- the

9 government's motion reads, if the defendant's present

10 level is the equivalent of a 38.

11    MS. JOHNSON:  Yes, Your Honor.

12    THE COURT:  That does seem to be correct.

13    MS. JOHNSON:  Well, we base that on the fact

14 that he -- we filed an enhancement given he has a prior

15 drug offense.  He's looking at a mandatory 20 years in

16 prison.

17    THE COURT:  I understand that.  But the

18 offense level under the guideline that you have here

19 doesn't take into consideration acceptance of

20 responsibility, which, as I had understood, you were

21 granting.

22    MS. JOHNSON:  Well, we are making a

23 substantial assistance motion from the 240 months,

24 which -- we did kind of an equivalent, we calculated

25 that as the equivalent of a level 38, because that is

1  what, as a matter of law, he's looking at. And the

2  reason that instead of the 240 months we should reduce

3  it to 180 months.

4           THE COURT: I see. So it's not strictly

5  speaking a 38; you're trying to analogize it to a level

6  38?

7           MS. JOHNSON: Exactly, Your Honor.

8           THE COURT: All right, I understand it then in

9  that context.

10          All right. Mr. Van de Veld, I'll hear from

11 you on behalf of Mr. Calvo.

12          MR. VAN DE VELD: Your Honor, there is one

13 person who would like to provide a short live testimony

14 to the court; it's the pastor of Mr. Calvo.

15          THE COURT: All right. I don't know that it's

16 necessary to swear him, but he can certainly approach

17 the lectern and make his statement on behalf of the

18 defendant.

19          (Pastor Crisostomo approached the lectern.)

20          THE COURT: Good morning, sir.

21          PASTOR CRISOSTOMO: Good morning, Your Honor.

22 My name is Cesar Crisostomo, I am the senior pastor of

23 the Island Hope Church where Duane is currently

24 attending.

25          THE COURT: Will you spell your last name for

1   us, please.

2          PASTOR CRISOSTOMO:  Crisostomo,

3   C-R-I-S-O-S-T-O-M-O.

4          THE COURT:  All right, Pastor Crisostomo, I'm

5   happy to hear from you this morning.

6          PASTOR CRISOSTOMO:  Thank you, Your Honor.

7   I'm here on behalf of -- to be here as a support of

8   course for Duane and the family.  In the last eight

9   months Duane has been involved with the family of

10  Island Hope Church.  I met him July of 2005 and gotten

11  to know him, and he has expressed his life and the

12  things that he has done.  And I believe, in just short,

13  not to take much time of the court's time, I believe

14  Duane Calvo is truly remorseful in what he has done,

15  and he is one that he has made life changes, and in his

16  decisions.

17         And I know he's one that he's also, not only

18  has he been a committed attendee of your church on a

19  weekly basis, he's also been coming to our house, along

20  with my wife, co-pastor, every Wednesday, just a time

21  of small group and accountability, and I've heard his

22  heart, and many times we're in our office and he's just

23  crying.  And he is truly a man of remorse.  And so,

24  Your Honor, today I do beg and hope for the court's

25  mercy and leniency in the sentencing of today.

1    I've seen him in how he is, you know, he is

2    with him family, with his kids, and truly he's, again,

3    I would like to repeat once again, he's one that is,

4    you know, remorseful for the things that he has done.

5    And I believe he's no longer a threat to the community

6    in the things he's sentenced for today.  And as a

7    matter of fact, I believe he's going to be a strength

8    of the things that he's learned from this, and will be

9    a greater influence in the future for the island and

10   the community here, to speak against the things that he

11   is sentenced for today.

12        So I just want to speak on his behalf, and

13   he's a friend, and he's a family of our church, and I'm

14   here for his support and to beg Your Honor's leniency

15   in the sentencing today.

16        THE COURT:  All right.

17        PASTOR CRISOSTOMO:  Thank you very much.

18        THE COURT:  Thank you, Pastor.

19        MR. VAN DE VELD:  Your Honor, there are some

20   matters that I wish to discuss concerning my client's

21   cooperation; some of it is the information which is

22   under seal based upon the document filed on behalf of

23   the government requesting the downward departure.  And

24   so, I don't know if the Court wants to hear that

25   outside of the hearing of the public, or whether --

1     THE COURT:  If it pertains, Mr. Van de Veld,

2  to information that is sealed and should remain sealed

3  and confidential, then I think the appropriate thing is

4  for me to hear from you at side-bar, with Ms. Johnson

5  present.

6     MR. VAN DE VELD:  Okay.

7        (Conference at side-bar as follows:)

8     THE COURT:  Good morning, again.

9     MR. VAN DE VELD:  Good morning, Your Honor.

10  Good to see you again, it's been a long time.

11     THE COURT:  Yes.

12     MR. VAN DE VELD:  My client cooperated with

13  the government, and his cooperation, which is

14  identified in the government's report I don't think

15  quite fully and completely describes his cooperation.

16  The presentence report doesn't fully and completely

17  describe his cooperation.

18     He has provided me notes of a log that he has

19  kept concerning the efforts that he made to cooperate.

20  And it starts off back when he was arrested in April.

21  The presentence report identifies that he cooperated

22  by trying to make a telephone call to the intended

23  individual who was going to do the greatest amount of

24  the sales of the quantity that was involved in the

25  arrest, which is a person by the name of Louis Hocog

1   Cruz.  He, following making that phone call, he tried

2   daily maintaining contact with DEA.

3           The DEA office here has been in somewhat

4   disarray since the transfer of two of its officers,

5   its resident officer and the second in charge of the

6   office, and so we now have a head DEA officer who

7   hasn't been on Guam a great deal of the time since he

8   was transferred here, and that's primarily because his

9   family resides off of Guam.

10          But Duane contacted the resident officer here

11  and the former second in charge, which was a person by

12  the name of Jon Anderson, and he continuously had been

13  setting up people at different game rooms that were

14  people that he had contact with who would buy

15  significant amounts from him and then turn around and

16  re-sell.

17          THE COURT:  Isn't this a situation where

18  because he was outed publicly, his uncle --

19          MS. JOHNSON:  Yes, Your Honor.

20          MR. VAN DE VELD:  Well, this is before his

21  uncle actually --

22          THE COURT:  So you're telling me he made some

23  efforts?

24          MR. VAN DE VELD:  Oh, personally he made some

25  significant efforts.

1    THE COURT: Did any arrests or prosecutions

2  result from his personal efforts?

3    MR. VAN DE VELD: No, Your Honor, and that's

4  not because of a lack of effort on his part, but it's

5  really based upon a complete lack of support from the

6  DEA office.

7    MS. JOHNSON: And that, of course, we disagree

8  with.

9    MR. VAN DE VELD: And I understand. However,

10  the fact is, is that the only way that he was

11  ultimately able to gain any cooperation was we had to

12  bypass the DEA office here and he cooperated with the

13  local police department.

14    THE COURT: Did arrests or prosecutions result

15  from that cooperation?

16    MR. VAN DE VELD: Just the arrest that's

17  referenced inside the government's motion.

18    THE COURT: That's the one where the uncle was

19  instrumental?

20    MS. JOHNSON: Uh-huh.

21    MR. VAN DE VELD: Correct.

22    THE COURT: But the defendant supplied the

23  information that led to that set-up, right?

24    MS. JOHNSON: I don't know. I talked to the

25  Sergeant, J.P. Aguon, and all he told me was that no

1   one would deal with the defendant, and so the uncle

2   stepped forward and said I'll try.  But I don't know

3   what the basis of the information was.

4          THE COURT:  My understanding from what I read

5   last night was that the defendant would supply the

6   information and point the uncle in the right direction

7   and told the authorities this is the person that --

8          MS. JOHNSON:  Could very well be.

9          THE COURT:  So I understand it, Mr. Van de

10  Veld, this is the legalities of this, once of

11  government makes the motion, I think the law, pre-

12  Booker law in the Ninth Circuit was that I then have

13  discretion to set the --

14         MR. VAN DE VELD:  Depart anywhere you wanted

15  to.

16         THE COURT:  Yeah, to depart anywhere I want.

17  Now, having said that, departures are largely beside

18  the point since Booker anyway.

19         MR. VAN DE VELD:  Correct.

20         THE COURT:  And so I can consider the

21  information that you've proffered under 3553.  And I

22  think that's what I prefer to do rather than call it

23  a departure and to deviate from the government's

24  recommendation.  I mean, I can certainly take that into

25  account under history and characteristics, and, you

1   know, his post arrest behavior.  So I take that into

2   consideration.  I have to tell you that I'm generally

3   deferential to the government on matters like this.

4           MR. VAN DE VELD:  I understand.

5           THE COURT:  I think in the first instance,

6   they are in the best position to assess the level of

7   cooperation and to talk about how bonafide it was.

8   Now, it may just be his bad luck that he was publicly

9   outed and contaminated and, you know, no drug dealers

10  would go near him because they figured it would be a

11  set-up.

12          MR. VAN DE VELD:  Well, actually that's part

13  of why I wanted the opportunity to speak to it, because

14  frankly, in his notes he indicates that he actually had

15  made some contacts and was in a position to try to move

16  forward with making buys; however, he was persistently,

17  throughout the entire month of April, told that DEA was

18  too busy and couldn't handle him.  Mr. Griffith says

19  the most he can handle is three people at one time, he

20  was already involved with three people.  So it wasn't

21  that he couldn't do it; he couldn't do it in connection

22  with DEA because they just weren't ready and willing

23  and able to accept his cooperation.

24          THE COURT:  Right.

25          MR. VAN DE VELD:  But he had made contacts.

1    He provided them with a considerable amount of

2    information.  In fact, he had provided them with

3    information about a Post Net operation where drugs were

4    being sent in via a post, postage, and he met with the

5    postal inspector and provided information on that.  As

6    to what has transpired from those investigations, you

7    know, I'm not sure.

8         THE COURT:  Are you aware of that, Ms.

9    Johnson?

10        MS. JOHNSON:  Yes, Your Honor.  I talked to

11   Craig Hales, who's the postal inspector, as well as

12   the DEA; the defendant's information has consistently

13   been too vague to be of any use to them.

14        For example, Mr. Hales said that he made the

15   allegation that a person was bringing in packages of

16   ice, but he could never give us a time or a name so we

17   could specifically intercept the drugs.  So it was

18   vague rumor and innuendo.  The DEA was prepared to work

19   him if he had significant information.  The fact that

20   when GPD, Guam police department tried to work him,

21   they didn't use him, they used the uncle because,

22   indeed, no one will talk to him.

23        This is such a small island that if we get a

24   new DEA agent off the plane, within 24 hours, everyone

25   knows about it.  It's very, very small.  If we make a

1    seizure at the airport, within 24 hours everybody knows

2    about that seizure, no matter how quiet we try to keep

3    it.  And Mr. Calvo was burned publicly, and that was

4    the end of his assistance.

5              MR. VAN DE VELD:  Well, in the past we've had

6    -- we had a DEA second in charge officer, his name was

7    Jon Anderson, the man was able to participate in drug

8    buys himself in the past; so even though people may

9    know of the existence of the people, it really hasn't

10   deterred people from being able to do operations.

11             We had a very distinguished police officer by

12   the name of John Bagaforo who worked on the task force,

13   he's very easily identifiable, shaves his head, he's a

14   big man, he's a man of large stature, he was a patrol

15   officer all of his career up until he went to the task

16   force, he was able to work undercover and complete

17   transactions on his part.  So --

18             THE COURT:  What am I missing here, though,

19   Mr. Van de Veld?  Because it occurs to me, having known

20   and worked with DEA myself, that they're fairly zealous

21   and aggressive, and if there's some way that they can

22   get turn somebody to get an arrest, they're going to do

23   that.  They're not going to ignore it.  I mean, what --

24   it doesn't square with my anecdotal experience that if

25   Mr. Calvo here had good solid information, that they

1   would turn him away because they were too busy.

2           MR. VAN DE VELD:  Well, that was Mr. Calvo's

3   experience.  He said consistently each time that he had

4   something set up, they told him they were too busy with

5   other operations, they were unable to complete them.

6   And --

7           THE COURT:  Do you think that might have been

8   a pretext, because they just thought, you know, there's

9   not much he's giving us the past, it's been too vague,

10  and we can't use him to make the connections for us, so

11  it's kind of a dead end, dry hole?

12          MR. VAN DE VELD:  Your Honor, I might say that

13  if it had been my experience prior to 2005.  Once the

14  change in leadership of the DEA here occurred, it's

15  been my experience that things have -- I've had many

16  clients who've tried to cooperate and simply aren't

17  able to get the cooperation completed.  The present

18  operation of the DEA office here seems to be more in

19  disarray than I've ever seen any law enforcement

20  activity.  And so I would concur with your assessment

21  that in the past DEA has been aggressive in pursuing

22  information when it was available.

23          I think there is a nuance in this case though,

24  that also I should point out, which is J. Y. Anderson,

25  who was the former second in charge, was at one point

1    in time engaged to the sister of the co-defendant, Troy

2    Santos, in this case. And as a result of Troy having

3    been arrested, John was extremely angry with my client,

4    who was Troy's wife's cousin, and so I think that those

5    personal feelings invaded the circumstances in this

6    case.

7              MS. JOHNSON: It's the first I've heard of any

8    of this.

9              THE COURT: Pardon me?

10             MS. JOHNSON: This is the first I've heard of

11   any of this. And if I were to call the DEA, I think

12   they would deny it.

13             There's been a major change in policy in this

14   sense, is that Jon Anderson would work with people even

15   after they lied to him the first time, he'd interview

16   them, they'd lie; he'd say, "hey, you're looking at 20

17   years," and then their lawyer would get a hold of them

18   and say, "you're really looking at 20 years," and then

19   they'd come clean. The policy has now gone to what

20   apparently is a nationwide policy, that if you lie to

21   them, they're not interested in you again, no matter

22   how sincere you are. And that's been a significant

23   change. And it's materially reduced the number of

24   people working for us.

25             THE COURT: And did that happen here; I mean,

1  is there an allegation Mr. Calvo didn't tell them the

2  truth?

3         MS. JOHNSON: No. And in this case, it was

4  something -- it was a matter of his information being

5  too vague to be of any use to them specifically.

6         THE COURT: All right. Well, I will take into

7  consideration what you've said, Mr. Van de Veld.

8  Frankly, I don't think I'm in a position to second-

9  guess decisions made by the DEA in the first instance,

10  and the U.S. Attorney in the second instance, as to

11  how valuable the information is. It puts me in a very

12  uncomfortable position. I'm not a prosecutor and, you

13  know, generally I have to defer to their decisions

14  about whether the evidence is strong enough to

15  prosecute, whether they want to go forward with a case.

16         Here in essence I'm being told the information

17  was too vague to make any case, and so they deemed the

18  information not worthwhile. And they've made an

19  assessment given what he was able to do with the

20  assistance of his uncle. And I appreciate what you're

21  saying, that he feels frustrated because he wanted to

22  do a lot more and he wasn't getting his telephone calls

23  answered. But you see the dilemma that puts me in.

24         MR. VAN DE VELD: I understand.

25         THE COURT: I'm at the point where I have to

1   say, well, okay, I'm going to make an assessment of

2   whether the law enforcement pursued zealously the leads

3   that Mr. Calvo was providing, and I'm ill-equipped to

4   do that. But I will take generally into consideration

5   what you've said.

6          MR. VAN DE VELD: Thank you very much, Your

7   Honor. Thank you.

8          THE COURT: All right.

9            (Side-bar concluded.)

10         THE COURT: All right, Mr. Van de Veld, you

11   may continue.

12         MR. VAN DE VELD: Thank you, Your Honor.

13         Your Honor, I too, as the Court earlier

14   discussed with the government, noted that in the

15   assessment of what it was that they were indicating

16   in their moving papers regarding the extent of the

17   cooperation, indicated that it was worthy of a three-

18   point reduction in, against the sentencing guidelines,

19   and that that three-point reduction had been misapplied

20   as to the actual guidelines under the presentence

21   report in this case.

22         And while the government suggests that --

23   its analogy was to provide for something different --

24   I think that the cooperation here is significant. The

25   extent of the cooperation was such that it resulted in

1    a significant arrest on behalf of the government.  And

2    so I think that it's important that -- in the past,

3    similar forms of assistance have resulted in at least

4    three, sometimes greater levels of reduction against

5    the sentencing guidelines.  Then, in being consistent,

6    that three levels should really be reduced against the

7    actual guidelines of the particular case.

8         With the base offense level having been 38,

9    subtracting off three levels for the acceptance of

10   responsibility, and subtracting off a further three

11   levels, would take this offense to a level 32 with a

12   range of 121 to 151.  I think that the Court should at

13   least go no higher than the 121 months indicated in the

14   sentencing table for that level.

15        THE COURT:  Well, that presumes he's in

16   criminal history category I.  He's not.

17        MR. VAN DE VELD:  Excuse me, you're right.

18   The 135 -- I'm sorry -- which is criminal history

19   category II.

20        THE COURT:  Has there been an outcome in the

21   case in which he gave some assistance?

22        MR. VAN DE VELD:  No.  That case, Your Honor,

23   my understanding is, is that it is still in a pretrial

24   stage.

25        MS. JOHNSON:  Your Honor, may it please the

1   Court, I talked to the Assistant Attorney General Monte

2   May yesterday.  The defendant was released from custody

3   prior to being indicted, and apparently has fled the

4   island; they have a warrant out for her arrest.  She's

5   been indicted, warrant outstanding, and that's the end

6   of it at this point.

7           THE COURT:  That case was brought in state

8   court?

9           MS. JOHNSON:  It was brought in the Superior

10  Court by the local attorney general.

11          THE COURT:  Okay.

12          MR. VAN DE VELD:  Thank you, Your Honor.

13          Your Honor, my client is of course going to

14  speak to the court about his circumstances on his own,

15  but I'd like to discuss some of the circumstances here.

16  This is my client's second offense of a drug nature.

17  And the law generally presumes that the penalty that is

18  imposed should twice of what it was that was available

19  to punish the defendant under an original case.  In his

20  original case he was sentenced to 30 months.

21          The reason for the guideline level in this

22  particular case being as high as it is, is because of

23  the amount of drug involved.  As the Court is well

24  aware, under the Sentencing Guidelines we determine the

25  level of the offense based upon the quantity of the

1   amount involved.

2          And if Your Honor looks at the facts and

3   circumstances of this case, in this particular case,

4   the circumstances are that Mr. Calvo was essentially

5   going to be fronted two kilograms of ice, initially for

6   the payment of $5,000 as a down payment.  There's

7   nothing that indicates in the presentence report that

8   this was an amount that Mr. Calvo was looking for, and

9   does not appear to be consistent with amounts that had

10  previously -- that he had previously been involved

11  with.

12          THE COURT:  Where did the first mention of the

13  amount come from; did it come from Mr. Calvo or did it

14  come from the informant?

15          MR. VAN DE VELD:  My understanding is it came

16  from the informant.

17          THE COURT:  You agree with that, Ms. Johnson?

18          MS. JOHNSON:  No, Your Honor.  We always try

19  to get money up front.  She called -- she had been

20  dealing with the defendant for years when he worked

21  with the Guam Water Authority in kilo amounts.  She had

22  called him now that she was convicted, of course, and

23  working undercover for DEA, called and said "I've got

24  two kilos, I will front it to you but I want cash up

25  front".  He tried to get the cash, was unable to, and

1  so she said, "all right, I'll give it to you without

2  cash up front". But initially, we wanted cash, and he

3  was not able to come up with it.

4  THE COURT: But the amount, the first mention

5  of two kilos, that was from the informant rather than

6  from Mr. Calvo?

7  MS. JOHNSON: The informant said "I've got two

8  kilos, do you want to move it for me?"

9  THE COURT: Now, you represent that she had

10  previous dealings with him?

11  MS. JOHNSON: Yes, Your Honor. That's why we

12  were able to identify him. Her name is Kimmie Dang;

13  she and her boyfriend, I should say several boyfriends,

14  were arrested in November of 2003. They were moving

15  kilos of ice. When she plead guilty and she agreed to

16  cooperate with us, she identified one of her major

17  distributors as Mr. Calvo, who at that time was working

18  for the Guam Water Authority. She said that he would

19  call, ask for more product, they call it, she would

20  deliver up to a kilo at a time to the Water -- to the

21  parking lot of the Water Authority, and he would pay

22  her then, take the kilo, distribute it, and then ask

23  for more.

24  THE COURT: Was there ever an instance that

25  she recounted where he took delivery of more than a

1   kilo?

2          MS. JOHNSON:  I think at one time she might

3   have delivered 1.5, but I'm not certain about that.

4   It's been several years since I've reviewed the

5   deliveries that she made to him.

6          THE COURT:  Here's the part of it that I'm

7   uncomfortable with, and it's been a source, I think,

8   of discomfort historically, when the penalty is based

9   on the amount.  And here we don't have an actual

10  transaction of methamphetamine, we have look-alike

11  methamphetamine.  And the amount originates with law

12  enforcement.  I mean, what's to say they couldn't have

13  said, we've got five kilos, and if he was willing --

14  and, you know, there's no question in this case as I

15  look at this, he was willing, this isn't a case where

16  he was entrapped, he doesn't claim entrapment.  But it

17  just seems to me that there's a certain arbitrariness

18  when the amount of the drug dictates the penalty, and

19  the amount originates with law enforcement.

20          I'm not accusing anybody of any wrongdoing,

21  I'm just saying that it seems to me somewhat arbitrary

22  to say you're subject now to 20-year mandatory minimum

23  because the authorities decided that they would sell

24  you two kilos, or tell you that they had two kilos for

25  sale rather than one kilo.

1    MS. JOHNSON: In this case it is not, Your

2  Honor. In essence it was a test. She had other

3  distributors distributing less for her, for example,

4  a hundred grams at a time, and she identified those

5  people for us. But she said Mr. Calvo could move

6  kilos, and we wanted to test that. A kilo is a lot.

7    THE COURT: But what am I to make of the fact

8  that he couldn't come up with the money, and he was

9  never offered the opportunity to buy a lesser amount?

10   I mean in ordinary exchanges, whether it's

11 drugs or something else, if you can't afford two kilos,

12 you say, well, maybe I'll take one kilo. And that

13 opportunity was never offered. Had that been offered

14 and had he paid for that amount, then I'd have no

15 problem saying, all right, you got yourself into this,

16 you knew exactly what you were doing. But here we

17 didn't have a consummated transaction. As I understand

18 it, he got to the room, told the informant that he

19 couldn't come up with the money, and there was some

20 other conversation; at that point he was arrested.

21   No question he was willing. The question I

22 have is that he was unable at that point, and wasn't

23 given the alternative to maybe take a lesser amount.

24 And had he done so, had that alternative been given,

25 then he wouldn't be facing the huge sentence that he

1   faces today.  That's the part that is, seems to me a

2   little bit subjective and arbitrary.

3         And again, I'm not suggesting that anyone did

4   anything wrong, anybody had untoward motives.  I'm just

5   suggesting that this is -- I'm not comfortable with the

6   arbitrariness of how a penalty attaches because someone

7   decides this is the amount we're going to offer for

8   sale.

9         MS. JOHNSON:  What I'm trying to say in this

10  case is that it's not arbitrary.  She said he was her

11  major distributor, that he was moving kilos for her.

12  And that reflects a certain organization and a certain

13  ability to move that amount.  And part of it, as I say,

14  was a test to see whether or not he actually thought he

15  could move two kilos; and the answer is yes, he thought

16  he could, because he had done it before.

17        THE COURT:  What would the penalty be had the

18  agents said, we have one kilo for sale, or one kilo for

19  distribution?

20        MS. JOHNSON:  Well, in effect, no difference.

21  He is looking, because he has a prior drug conviction,

22  at a mandatory 20-year sentence, 240 months.

23        THE COURT:  So even if it had been a single

24  kilo, you say the penalty scheme would be the same?

25        MS. JOHNSON:  He would be looking at a

1  mandatory 20-year sentence.

2          THE COURT:  Okay.

3          MR. VAN DE VELD:  But not under the

4  guidelines.  Under the guidelines, instead of it being

5  a level 38 base offense, it would have been a level 36

6  base offense, it would have been a two-level --

7          MS. JOHNSON:  What I'm saying is -- I'm sorry.

8          MR. VAN DE VELD:  Excuse me -- it would have

9  been a two-level difference in the base offense level.

10  And while the guidelines are not mandatory, and because

11  of *Booker Fanfan* decision, they still must be taken

12  into consideration.  And once the motion for downward

13  departure is made, then the Court really is free to

14  look at those sentencing guidelines.  And in looking

15  at those sentencing guidelines and applying them, this

16  would have been a level 36 offense rather than a level

17  38 offense.  So it does affect the sentencing

18  considerations, contrary to what the government says.

19          MS. JOHNSON:  Well, actually it does affect

20  them in this sense, Your Honor:  That he should

21  receive, and he deserves to receive 240 months.

22  Because he has tried to cooperate and did provide one

23  drug dealer to the local authorities, we think that a

24  five-year reduction from that amount is appropriate.

25  We do not think a further reduction is appropriate

1   given the history of him and the amount of ice that he

2   has been moving.  So we stand by our 180 months.

3           THE COURT:  Ms. Johnson, how many instances

4   did the informant relate, prior to this aborted

5   transaction, where she had -- what did she tell you,

6   how many times did she deliver kilo quantities to

7   Mr. Calvo?

8           MS. JOHNSON:  For the last two years before

9   her arrest, since 2001, he had been their major

10  distributor.

11          THE COURT:  But I need some flesh on the

12  bones; what does that mean?  How many --

13          MS. JOHNSON:  Pardon me?

14          THE COURT:  I said I need some flesh on the

15  bone.  Would you say, think back, give me a ballpark

16  figure of how many times she delivered kilo quantities

17  to him and he paid for them.

18          MS. JOHNSON:  She estimated that she was

19  dealing with him between three and four kilos a year

20  minimum.

21          MR. VAN DE VELD:  Your Honor --

22          MS. JOHNSON:  If I may finish.  She did not

23  keep accurate drug records.  The first thing we look to

24  do is to see if we have pay-and-owe sheets, and we

25  didn't.  So that was her recollection, and also the

1    recollection of the people who delivered with her.

2            THE COURT:  All right.  Thank you.

3            Go ahead, Mr. Van de Veld.

4            MR. VAN DE VELD:  Your Honor, only because of

5    the fact that I'm familiar with the cooperating witness

6    who led to the arrest of the defendant am I privy of

7    the information that government counsel has spoken

8    about.  I don't think it accurately portrays the

9    information that was provided, which is that Mr. Calvo

10   was one of four people who were regular distributors,

11   according to that confidential informant for that

12   organization.  That organization moved kilos of ice.

13           I don't recall her saying that at any one time

14   she had given an amount of a kilo or more to Mr. Calvo.

15   I do recall her saying that, that she had given large

16   quantities to him and that he had moved them, and sold

17   them.  But I don't recall anything as far as --

18   certainly nothing that she mentioned about a kilo and a

19   half or two kilos.  And so --

20           THE COURT:  What about the -- Ms. Johnson said

21   that when pressed, the informant said, hmm, I think

22   maybe three to four kilos a year.  Was that figure,

23   that three to four peculiar to Mr. Calvo, or to a group

24   of people?

25           MS. JOHNSON:  Oh, to Mr. Calvo.  But I

1   suggest, if this is an important point, then I suggest

2   we have an evidentiary hearing and we call Kimmie Dang

3   to the stand; she was the one making the deliveries to

4   him.  And then we'll have it out of the horse's mouth.

5              THE COURT:  Well, if you dispute that --

6              MR. VAN DE VELD:  I do dispute it.

7              THE COURT:  Maybe we should have her here.

8   How long would it take to get her here, Ms. Johnson?

9              MS. JOHNSON:  I don't know, Your Honor.

10             THE COURT:  Is she still on Guam?

11             MS. JOHNSON:  To my knowledge, she's still on

12  island.  That case is being handled by another AUSA, so

13  I do not know immediately where she is.  I'd have to

14  call DEA.

15             MR. VAN DE VELD:  She is my client, Your

16  Honor.  She is here on Guam.  She is --

17             THE COURT:  What are we going to do about that

18  then?

19             MR. VAN DE VELD:  I met with her yesterday.

20             THE COURT:  What are we going to do about

21  that?  I mean, if she's your client, you can hardly be

22  in an adversarial position to her, which you would be.

23  You dispute what Ms. Johnson attributes to her.

24             MR. VAN DE VELD:  That's correct.

25             THE COURT:  So what's your suggestion?  It

1   seems to me you can't represent both, and having

2   represented her previously, you're hardly in a position

3   to take an adversarial position in this case.

4           MR. VAN DE VELD:  I actually think that the

5   information can be provided from the records of DEA and

6   doesn't necessarily have to come from Ms. Dang.

7           THE COURT:  Did she --

8           MR. VAN DE VELD:  I was present, Your Honor,

9   when she was --

10          THE COURT:  Would you be satisfied with that?

11          MR. VAN DE VELD:  I believe so.  Your Honor,

12  I was present when she was interviewed on three

13  occasions, and in detail.  The first time the interview

14  was conducted over a two-day period, her initial

15  interview, and it was extensive, and full and complete

16  information was provided.

17          THE COURT:  Ms. Johnson, is the agent here who

18  debriefed the informant?  Is that person still on Guam?

19          MS. JOHNSON:  No, he is not, Your Honor.  And

20  I would need to find the agent and I would need to find

21  her, frankly.  I think if we're going to have a

22  contest, then there won't be any question as to what

23  she told the DEA, whether there was a misunderstanding.

24  I think she should be called to the stand.

25          THE COURT:  Tell me this.  And maybe I'm

1  making a hard one out of an easy one with trying to be

2  too specific with the amounts.

3  What amount is the trigger for the 20-year

4  mandatory minimum, if one has a serious drug prior?

5  MS. JOHNSON: More than 50 grams.

6  THE COURT: Is there any question in your

7  mind that the informant told the agent, the DEA agent,

8  Mr. Van de Veld, that she had on several occasions

9  delivered more than 50 grams to Mr. Calvo?

10  MR. VAN DE VELD: No, Your Honor.

11  THE COURT: Okay, then I don't think we need

12  to have the hearing.

13  The concern I had, of course, was with the

14  arbitrariness of suggesting an amount that becomes

15  a trigger for a high mandatory minimum. But

16  understanding now that the trigger is quite low, and

17  you don't dispute that the -- I know you're not

18  necessarily agreeing with the assertions of the

19  informant, but if you don't disagree that at least

20  that's what she told the DEA, that she had had multiple

21  liaisons with Mr. Calvo, and that they involved a drug

22  amount of at least 50 grams or more, then seems to me

23  that answers the question that I had.

24  MR. VAN DE VELD: Well, it may answer the

25  question that you had regarding the mandatory minimum,

1   but I think it does impact the sentencing guidelines.

2   And I would continue to argue --

3         THE COURT:  Okay.  And I agree with your

4   observations concerning the guidelines.  I think

5   they're still an important part of the sentencing

6   matrix; two of the seven factors under 3553 are

7   expressly guideline factors.  The sentencing range

8   provided for by the guidelines and pertinent policy

9   statements of the sentencing commission, the other

10  five factors are subsumed within the guidelines, so --

11  and I think when one looks at the decision in *Booker*,

12  particularly the remedial part of the decision, there's

13  little question that the guidelines were intended to

14  significantly continue to inform the federal sentencing

15  process, they're not just not mandatory.  So I

16  understand your argument by analogy that if we are

17  talking about a lesser amount, then the starting point

18  is not 38, it's 36.

19        MR. VAN DE VELD:  Yes, Your Honor.

20        THE COURT:  Then I hope you agree, I don't

21  think we need an evidentiary hearing on this point.

22  It's a point that I raised, and it's been answered to

23  my satisfaction.  So --

24        MR. VAN DE VELD:  And the amount of greater

25  than 50 grams is consistent with what my recollections

1    are of what Ms. Dang --

2          THE COURT:  The informant said?

3          MR. VAN DE VELD:  -- had testified, or had

4    provided information to the government concerning the

5    activities.

6          THE COURT:  Okay.

7          MR. VAN DE VELD:  But I also did want to make

8    clear that she had indicated four individuals as

9    opposed to a singular individual in that particular

10   activity, because I think it leaves a wrong factual

11   impression.  And I wanted to --

12         THE COURT:  Well, again, that would not be

13   legally significant if Mr. Calvo was one of the four

14   anyway, right?  I mean, the entire amount could be

15   attributable to him even if he was acting in concert

16   with three others.

17         MR. VAN DE VELD:  Well, and that's the thing,

18   is that he wasn't.  The other three were distributing,

19   distributing in concert with Ms. Dang, but not in

20   concert with Mr. Calvo.  And that's why there is a

21   distinction.

22         THE COURT:  Okay.

23         MR. VAN DE VELD:  As the Court discussed,

24   Mr. Calvo couldn't even come up with the $5,000

25   necessary to acquire the two kilograms.  I think that

1  this information is important because of the fact that

2  this relates to the extensiveness of his activities.

3  Mr. Calvo had been involved in the sale of ice, and he

4  acknowledges that, and he will tell you further about

5  that during the course of his allocution.

6      But when he originally arrived back on Guam

7  after having served his sentence, he tried to remain

8  free from using the drug ice, free from participating

9  in the sale of the drug ice.  However, there are really

10  two forms of an addiction that emanate from using and

11  selling ice.  One, of course, is the substance abuse

12  itself; the other is the familiarity with the fact that

13  the sale of ice produces large sums of money very

14  quickly.  Mr. Calvo, like many people, faced the burden

15  of supporting his significant other and his children.

16  He was able to get a job in which he earned

17  approximately $10.24 an hour as a employee; however,

18  the money that he earned was inadequate to pay his

19  bills.

20      If you look at the presentence report, he has

21  two judgments against him that relate to unpaid rent.

22  Mr. Calvo felt a substantial pressure to essentially

23  engage in the financial transaction side of the

24  addiction once he returned to Guam in order to meet his

25  responsibilities to the people that he loved and cared

1   for.

2         THE COURT: What am I to make of the fact that

3   his father said that he tried to help him too? He

4   assisted, he said, by helping Mr. Calvo get his job,

5   and providing him with a rent-free house, and then

6   occasionally gave him money.

7         MR. VAN DE VELD: Yes, Your Honor. He did

8   that. And Mr. Calvo -- his father did a great deal

9   to try to help him. However, Duane wanted to have the

10  pride of being able to stand on his own two feet, to

11  be able to be responsible for his family.

12        Accepting assistance from people is difficult

13  for some people to do. It erodes a person's personal

14  pride. Being a -- burdening someone for a long period

15  of time for their charity has a substantial impact upon

16  a person's feeling of self-worth, and it is that

17  erosion of personal integrity, personal feeling of

18  self-worth that led to Mr. Calvo being involved in the

19  activities.

20        His subsequent activities didn't produce great

21  deals of income for him. He was -- he did pay for what

22  it was that he had acquired to the people who he had

23  acquired it from, but what he had left over didn't

24  produce a significant residual. It did produce at one

25  point in time, he had accumulated a sum of $30,000

which was stored in a car, a Corvette car, at the house
of his co-defendant, Troy Santos. That car was broken
into and the $30,000 was stolen. Other than that, it
didn't produce great income for him.

He doesn't -- he doesn't possess the trappings
in life of somebody who has made great deals of money
from his activities; unlike many people who are
involved in the sale of drugs. The money that he
received basically went to pay for necessaries of life
for him and for his children and his significant other.
They didn't go to extravagant things like flashy
jewelry, expensive cars; he wasn't driving a Mercedes
Benz or a BMW, he was still living a life of very
modest means. And I think that this -- these facts
have significance because of the fact that they don't
suggest the kind of image of a drug dealer that
normally is associated with someone who is moving large
quantities of drugs.

As the letters provided to the Court and the
testimony of his pastor suggest, Mr. Calvo is greatly
remorseful for having slipped back into the activities
that he had previously engaged in. But I think that
it's important to understand that while there is the
substance abuse addiction, there is also that addiction
to being able to acquire income and to meet the needs

1   that a person has, both when they need the substance,

2   and later as to paying expenses.

3         His conduct was not of the heinous nature that

4   is also associated generally with drug dealers.  He

5   fronted a large amount of drugs to people who didn't

6   pay him for it.  He didn't possess a gun during the

7   course of dealing drugs.  He wasn't involved in the --

8   in physically assaulting people to get them to pay him.

9   The more heinous activities that are associated with

10  the sale of drugs are not the kinds of activities that

11  Mr. Calvo performed.

12        And so, I know that Your Honor has reviewed

13  the presentence report in substantial detail.  I'd like

14  to suggest that if this had been an amount that he had

15  generally acquired, this would have been something in

16  the neighborhood of a level 32 offense rather than a

17  level 30 -- excuse me -- level 34 offense rather than

18  a level 36 offense.

19        If the court were to take three levels off for

20  acceptance of responsibility, that would take it down

21  to a level 31.  If the Court were to depart another

22  three levels, consistent with what the government has

23  said was the value of his cooperation, we'd be looking

24  at a range, at level 28 of 87 to 108 months.  Now that

25  sentence would be certainly much more than twice the

1  amount of punishment that Mr. Calvo received under his

2  original sentence, which was 30 months. Anything more

3  than 60 months is twice what it was that he had been

4  punished before.

5          Mr. Calvo at one point in time, and the

6  presentence report bears it out, had contemplated

7  leaving Guam; it was his desire to leave Guam because

8  of the fact that he wanted to get away from all of the

9  activity that he was involved in. He couldn't level

10  with his father and explain to him that that's why he

11  wanted to leave. His father thought that was a foolish

12  decision because his father didn't have all of the

13  information available to Duane, didn't understand why

14  it was Duane's motivation to try to get out of this.

15          So it isn't that Duane hasn't felt remorse

16  about this, even after he had gotten started back into

17  it. He wanted to try to escape from the activities, it

18  just was very, very difficult for him to do so under

19  the financial pressures that he found himself under;

20  they're significant, they're identified in the report.

21  It was -- it was his desire to try to appease everyone

22  that led to his involvement. And as he will tell you

23  out of his own mouth, it was the activities that other

24  people had known that he was involved in, in ice before

25  by his prior arrest that led them continuing to come to

1  him once he had returned to Guam.

2  And so, Your Honor, I ask the Court, because

3  of the fact that any sentence that this court imposes

4  is going to have a substantial impact on the defendant.

5  This is a person who treasures his family, he treasures

6  his daughters.  The presentence report is very clear

7  about the fact that he is a strong family man, he very

8  much loves and cares for his children.  Any sentence

9  that Your Honor will impose upon Duane will have

10  significant and harsh consequences for him.

11  And he understands that once he has served

12  this time and he is released, that if he should commit

13  another drug offense, he's essentially looking at life

14  imprisonment as a mandatory sentence.  He understands

15  the significance of it.  As he has tried to get out o

16  it during the course of this conduct that led to this

17  offense, he intends to try to make sure that he lives

18  in an environment that will not expose him to falling

19  back into the circumstances once he's released.  He

20  wants to be able to fulfill his responsibility,

21  responsibilities to his significant other and his

22  children.

23  And for that reason, Your Honor, I ask the

24  Court to impose a sentence as lenient as the Court in

25  its good conscience feels that it can, but certainly no

1  greater than a hundred and -- no greater than the 87 to

2  108 months of level 28, for criminal history category

3  II.  Thank you very much, Your Honor.

4        THE COURT:  Thank you, Mr. Van de Veld.

5        Mr. Calvo, I'll hear from you now, whatever

6  you want to say on your own behalf.  If you'll approach

7  the lectern, please.

8        THE DEFENDANT:  Honorable Judge Burns, on

9  February 18, 2005, I betrayed the trust of not only my

10  family and friends, but also the laws of the United

11  States and the laws of Guam, because on that day I

12  attempted to obtain the drug ice.  I want to take this

13  time to emphasize and explain my actions.  It's

14  important to understand why it is that I am back here

15  before this court.

16        I understand the Court and law punishes second

17  offenders harshly.  I also understand that a harsh

18  punishment is more severe than a first offender.  That

19  is why I want to explain why I violated the laws of the

20  United States and the laws of Guam.  As you already

21  know, this is not my first offense for the drug ice.  I

22  was a user, a seller, and a distributor when I offended

23  the first time, and I was busted and later sentenced to

24  prison for 30 months, which I had served my time in

25  California's Lompoc intensive confinement center,

prison.

          After I served my sentence, I came home to an
environment that was still surrounded with the drug
ice.   Your Honor, this island is smaller geographically
and the number of people in this community, it was very
easy for me to fall back into the situation.   I have
tried to leave island and relocate, but I couldn't tell
anybody why.   Nobody really understood.   As a result, I
did not get any support.

          Many people that I knew were still doing the
drug, came to me constantly questioning where they were
able to get or buy drugs.   I told them I was through
and I did not want to get involved.   I did not want to
get involved and tried to stay away.   But because of
the constant pressure, I slowly started getting myself
involved again.   Then all of a sudden, I found myself
back in the game.

          This time I was not using drugs, this time was
all about the money.   Because of my financial
obligations, going back to selling ice was easy and
fast, and -- that was fast and easy.   Making a quick
$20 was much more enticing than working at 7.62 an hour
job, and before I knew it, $20 became $40, $40 became
$60, and so on.   I never ever intended to hurt or harm
anyone.

1    Even though I knew it was against the law, it

2  seemed a lot easier to support my family with the money

3  I received.  I wanted them -- I wanted them -- I wanted

4  to provide what I considered a better living for my

5  family, most especially my kids.  I wanted them to have

6  the best education by sending them to private schools

7  and day cares.  However, I do not consider myself a big

8  time drug dealer, but rather, a middleman that was able

9  to make a deal happen.

10    I do not have any guns or weapons of any sort.

11  I do not own expensive jewelry, I do not have gold

12  chains hanging from my neck with three-inch diamond

13  pendants.  My significant other does not have jewelry

14  of the sort, nor did I have bank accounts of

15  unbelievable amounts.  I do not have a wardrobe full of

16  brand name clothing.  I do not drive lavish cars or

17  live a lavish lifestyles.  Absolutely, nobody would

18  have known that I was -- known what I was involved in

19  at that time.

20    Before I hit rock bottom financially, I

21  managed to store 30,000 in my cousin's Corvette, but

22  was later stolen, and that was the last of any moneys

23  that I would have.  I drive a used Toyota truck; my

24  significant other drives a 1999 Mazda Protege.  My kids

25  attend public school.  I wore basic clothing, jeans and

1  T-shirts, and our basic necessities for survival.

2       I did not do this to get rich, it was about

3  my family's survival. My kids did not have a bedroom

4  set in their bedroom until this past Christmas, which

5  was put on layaway until their mother was able to make

6  full payment. And they still do not sleep in the

7  comfort of air-conditioned rooms.

8       I was not able to make any money because I was

9  constantly being pressured to front out the product and

10  be paid later. Not everyone came to pay. In return, I

11  would have to pay the debt myself.

12       You are probably wondering why I was busted

13  with large amounts of drugs. It came about when the

14  confidential informant offered such amount and was

15  willing to give it to me up front. My addiction

16  prevented me from saying no. In that mindset, what was

17  I supposed to say? It was easy to pass up this amount

18  considering the fact that I felt I needed to keep my

19  head above water, and any amount offered to me, whether

20  it was one gram or ten pounds, I probably would have

21  taken it.

22       I cannot even begin to imagine the countless

23  people and families I have impinged on, including my --

24  including my very own, because of this sinister act.

25  I'm overcome with shame and humiliation because of my

1  weakness and addiction, not merely to the drug itself,

2  but rather to the addiction of the moneys that can be

3  made from it.  My own family suffers and will continue

4  to suffer because of my addictions and selfishness.

5      Now that I am not able to provide any

6  financial or emotional support in any way, the day I

7  was arrested I cooperated fully to the extent of my

8  knowledge by providing information about other drug

9  activities that I was aware of.  I continued to try,

10  and was more than willing to work with the agents to

11  the best of my abilities, but was constantly put on

12  hold.  I then tried working with the postal inspector,

13  and also with the local police.  Nothing seemed to go

14  my way as far as my cooperation, because I was

15  constantly shot down.  But that did not discourage or

16  deter me from continuing to try and make things right.

17  Here's a list of my log sheets that contains some of my

18  attempts at cooperation.

19      MR. VAN DE VELD:  And this is the information

20  we discussed at side-bar, Your Honor.

21      THE COURT:  All right, I have that in mind.

22      THE DEFENDANT:  Many of my family members were

23  upset and gave remarks such as, gosh, when didn't you

24  learn?  Didn't you even stop to think about your

25  children?  Although these were being said, I could not

1　respond.　I knew in my mind and in my heart that I was

2　wrong.　The bottom line is that I was selfish and self-

3　centered.　I take responsibility for my shortcomings

4　and disregard for the law, but most of all, for the

5　pain I've inflicted once again upon my family, loved

6　ones, and the community.

7　　　　Although I'm unsure of the outcome of today, I

8　would like to take this whole situation -- I would like

9　to think of this whole situation as a blessing in

10　disguise for me.　Through this I was able to reflect

11　into my life, and most of all -- and most of all find

12　the Lord, whom, through this has become my strength and

13.　my salvation.　Through the hands of the Lord I was able

14　to overcome my addictions and weaknesses.

15　　　　The Lord has also brought me, my family closer

16　to the Lord more than ever, but also --　but most of

17　all, it has made me realize I have a greater calling

18　and purpose in this world.　I now know that I have much

19　more to offer to others who may be going through

20　similar situations as I am, with the help of the Lord,

21　Jesus Christ.

22　　　　In all sincerity, I would like to thank all

23　the law enforcement agents and prosecutors, who

24　continuously work hard in their jobs, because through

25　them my life has been saved and has given me an

1  opportunity to turn my life around, no matter the

2  outcome of today.

3          Your Honor, the community of Guam, and most of

4  all my family, deserve more than a few words to express

5  my remorse and apology.  I hope and pray that you

6  accept every word that I have just shared with you,

7  because it's genuine and sincere.  No matter what the

8  outcome of my sentencing is, I stand before the Lord

9  and everyone involved today and promise that I will

10 never become involved in illegal drugs again.

11          I know the penalties for a third time

12 offender.  I'm not a career criminal.  I made mistakes,

13 more than once, but Your Honor, I know that I'm

14 salvable, and I have a lot to offer to society.  I need

15 not look back, but only look forward to whatever this

16 court may give me.  I only ask that you see and believe

17 also that this has turned my life around.  And I ask

18 for clemency, and I'm ready to accept what this court

19 gives me.  Thank you.

20          THE COURT:  All right.  Thank you, Mr. Calvo.

21          Anything else, Mr. Van de Veld?

22          MR. VAN DE VELD:  Nothing further, Your Honor.

23 Thank you.

24          THE COURT:  All right.  Ms. Johnson, I'll hear

25 from you on behalf of the United States.

1    MS. JOHNSON:  Thank you, Your Honor.

2    Your Honor, the defendant is looking at 20

3  year mandatory sentence.  The government is moving the

4  Court to sentence him to 15 years.  He deserves that

5  20-year sentence.

6    The methamphetamine hydrochloride being

7  distributed on Guam is between 97 and 100 percent pure.

8  For most people, it is instantly addicting.  A large

9  percentage of the population is addicted to this

10  substance, some people estimate as much as 50 percent,

11  and it's because of people like the defendant.  He

12  deserves all 20 years, and 15 years is, for the

13  government, a very substantial and lenient

14  recommendation.  And we ask the court to impose that

15  sentence.  Thank you.

16    THE COURT:  All right, thank you, Ms. Johnson.

17    I have mentioned this previously, it bears

18  repeating at this point, the guidelines are not

19  mandatory any longer, but they still inform sentencing

20  discretion.  And in the Ninth Circuit at least, I think

21  the responsibility of a sentencing court is to note its

22  guideline calculations so that any reviewing court may

23  first understand that the sentencing court took into

24  consideration the guidelines as is required, even in

25  the aftermath of *Booker*, and then also got it right,

1    got the calculations right.

2         There appears in this case to be no dispute

3    about the guidelines calculations.  I find that the

4    presentence report is accurate in setting forward the

5    calculations.

6         The base offense level, pursuant to the

7    guidelines for this amount of narcotic, and I

8    understand that there was no actual narcotic involved,

9    but a desire to possess and possess for distribution

10   some two kilos of methamphetamine, produces a base

11   offense level of 38.  Government's recommended a

12   three-point reduction for acceptance of responsibility,

13   which I find is warranted in this case.  Mr. Calvo

14   almost immediately admitted what he was doing, what he

15   was involved in, he pled guilty without a trial, and

16   saved substantial resources for the government in that

17   regard.  So the three points are warranted and I would,

18   were this strictly a guidelines case, adjust down to

19   35.

20        The government also had requested a departure

21   for substantial assistance of three points.  They've

22   done it in a bit of an unconventional way, taking into

23   account the statutory minimum, which is 20 years,

24   they've down stopped that number rather than the

25   guidelines.

1          I think, Ms. Johnson, you can correct me if

2   I'm wrong, but I think the convention, while the

3   guidelines were still mandatory, was for the Court to

4   figure the reduction for substantial assistance off of

5   the guideline level rather than any mandatory minimum.

6          MS. JOHNSON:  Your Honor, even now the

7   mandatory minimum is the guideline level.

8          THE COURT:  I understand.

9          MS. JOHNSON:  And that is how we take it, we

10  take the guidelines to require a 20-year sentence, and

11  we go down from there.

12         THE COURT:  All right.  Well, in terms of the

13  statutory maximum -- excuse me -- the statutory

14  required sentence of 20 years, it wouldn't matter how

15  I calculate the guidelines because Chapter 4 leads me

16  back to that sentence.

17         But, I'm going to give Mr. Van de Veld the

18  benefit of the doubt on his argument in the guideline

19  calculation that I make.  And so were this strictly a

20  guideline sentence, I would take the three points from

21  the 35, which would produce a level 32, and a

22  sentencing range of 135 to 168 months, given that the

23  defendant has a drug prior that puts him in Category

24  II.

25         Now, as I said, all of that is really for

1   naught because Chapter 4 of the guidelines provides

2   that if there is a statutory minimum sentence that is

3   in excess of the guideline range, that becomes the

4   guideline sentence.   In this case, that provision

5   applies; there is a 20-year, 20-year mandatory minimum

6   for this amount of narcotic.   And therefore, the Court

7   finds that were I strictly applying a guideline

8   analysis, Mr. Calvo's guidelines would be 240 months.

9   That would be the sentence pursuant to the guidelines.

10          The guidelines, of course, are not mandatory

11  anymore, they're advisory.   But I want to take just a

12  minute to comment on a couple of the arguments that

13  have been made.   One is the argument by Mr. Van de Veld

14  that ordinarily a person does something a second time,

15  they can expect double punishment.   I think that's true

16  in my experience, Mr. Van de Veld, that punishment is

17  designed to be incrementally harsher, maybe not even

18  twice as harsh, but incrementally harsher.   No one

19  would suggest that Mr. Calvo should receive the same

20  sentence he got last time.

21          But here my anecdotal experience and my own

22  subjective feelings about what is a fair sentence have

23  really been displaced by Congressional judgment.   The

24  judgment of the United States Congress when they set

25  the mandatory required sentence in this case is that

1  someone with a prior conviction, such as Mr. Calvo, who

2  is involved with this amount of narcotic should do a

3  minimum of 20 years. That's not my judgment, it's the

4  judgment of the United States Congress. And you and I

5  both know that they have the power to make those

6  judgments and to enforce them with mandatory required

7  sentences which, unfortunately for Mr. Calvo, is what

8  he's subject to in this case.

9         The only dispensation that he's entitled to is

10 what the government's offered, which is to say, we'll

11 make a motion to get you out from under the mandatory

12 minimum. Were it not for that motion on the part of

13 the government, my hands would be tied, and the only

14 sentence that I could pronounce in this case would be

15 the 20-year sentence.

16        So, Mr. Calvo, I say that to tell you that you

17 were right to extend your thanks to the prosecutor, and

18 to the agents in this case, because they've gotten you

19 out from under a 20-year mandatory minimum.

20        Now I've acknowledged previously, again, I'll

21 acknowledge that once the government makes the motion,

22 then under the law of this circuit it's up to me to

23 decide what the appropriate sentence is anywhere I

24 suppose from zero to 20 years; I can agree with the

25 motion or disagree with it, or impose some sentence in

1  between.  And that remains the same, I think, even

2  after *Booker*.  I think departures are largely beside

3  the point.  Once the motion has been made, then I look

4  to all of the factors to determine what I think is a

5  reasonable sentence under 3553.  And I can stop talking

6  about numbers and talk in terms of common sense that

7  everyday people can appreciate about this crime.

8       Here's what I see Mr. Calvo, and Mr. Van de

9  Veld, Ms. Johnson.  I see a fellow here that has really

10  a lot of equities, he has a lot going for him.  I read

11  with interest his background.  He was on the honor roll

12  in high school, he played sports, he was a motorcycle

13  rider.  He has a tight, loving relationship with his

14  father, his father clearly cares about him; took him

15  and his brother back after essentially they were

16  abandoned by their mother, and raised them.  His father

17  stood by him despite his involvement in other previous

18  criminal activity.  When he got back to Guam the father

19  got him a job, father gave him rent-free housing,

20  provided him with money from time to time.

21       Mr. Van de Veld, I take your point that

22  everyone wants the dignity of being able to be self-

23  supportive and make their own money.  But here's where

24  I disagree with some of what's been suggested today.

25       Mr. Calvo's premise was that selling drugs,

distributing drugs was an equally dignified and
acceptable way to support his family. And I was taken
by his description, which I wrote down at the time,
that it was only about money, he said; he didn't have
an addiction when he came back after the 500-hour drug
treatment program associated with his first conviction.
So it wasn't because he was addicted to methamphetamine
and needed to satisfy an addiction; instead he said
himself, it was only about money. Fast, easy money is
the way that he characterized it.

He went on to say, of course, that he didn't
intend to harm anyone. And I have to tell you that I
think those statements are naive, I think they're
really naive, particularly the last one.

Ms. Johnson points out that there's a great
addiction to methamphetamine on this island, and it
is a scourge. You know that, Mr. Calvo knows that,
and I know that; addiction to any kind of drug, but
particularly methamphetamine, is a scourge. It
disrupts families, it ruins personal lives, results
in a great deal of hardship. And here was a fellow
who was perpetuating that scourge on the people of
this island where he grew up and where he has so many
acquaintances, by distributing methamphetamine, all
for fast, easy money.

 1          Now I think that's a very cynical thing, Mr.

 2   Van de Veld.  I just don't see anything redeeming about

 3   that.  And I look at his record and I see that he was a

 4   loving, and is a loving, supporting father.  I don't

 5   doubt that.  But I just think he's very turned around

 6   in his thinking when he would substitute dealing drugs

 7   to support his family for earning a legitimate living.

 8          You've done it and I've done it at times in

 9   my life, I've worked two jobs to have the things that

10   Mr. Calvo talked about.  I have children of my own,

11   Mr. Calvo, I know the burden of trying to support

12   children.  And I suppose, you know, if there was an

13   alternative for fast, easy money so I could discharge

14   my responsibility I might have considered that.  But

15   if it meant dealing drugs or violating the law or

16   perpetrating a scourge on my fellow citizens, I would

17   have quickly rejected it.  I would have said, you know,

18   as difficult as it is having a second job at night

19   time, beats the consequences of the other thing; I

20   don't want to do that to other people, I don't want my

21   kids to think of me in a way that I would think of

22   somebody who was a drug dealer, so I would have quickly

23   rejected that.  And I understand not everybody comes to

24   that judgment as quickly and readily as I might.

25          But you have a background here, you've been

1    convicted once before. You've stood in front of a

2    court and you've had a judge lecture to you about the

3    effects of dealings drugs. And then what really

4    bothers me is that you had successfully completed the

5    500-hour drug treatment program in Honolulu. You were

6    released from Lompoc and you went to that drug

7    treatment program. I'm familiar with the program. I

8    know that the things that I'm saying today about the

9    scourge of methamphetamine are front and center in that

10   program, and you knew it well. You heard from people

11   that deal every day with drug offenders and people

12   addicted to drugs, and you had 500 hours of training on

13   that, and still you came back and got involved in this.

14        I wonder about the $30,000 that was hidden in

15   the car. I don't know, I wasn't told expressly, but

16   the impression I have is that was the proceeds of drug

17   deals. Why else hide it in the car. If it's

18   legitimately earned money, most people keep their money

19   in the bank. So I have very little sympathy for the

20   fact that drug proceeds were stolen by somebody from

21   the car. That goes back to my point about disagreeing

22   with your premise that the path that you chose here was

23   somehow an acceptable alternative to working hard or

24   having a second job, or doing what most people do when

25   we walk out of this building. So I do reject that as

1    well.

2          Now, I commented that I was uncomfortable with

3    the seeming arbitrariness of assigning a mandatory

4    minimum sentence when we're not first dealing with an

5    actual amount of drugs, we're dealing with an implied

6    amount, a talked-about amount, and that the origin of

7    that amount came first from the informant.  But I have

8    to say that the concern I have has been answered by the

9    information provided by both of you, first that 50

10   grams or more, not one kilo or two kilos, would have

11   triggered this penalty anyway.

12         There's little question in my mind, Mr. Van de

13   Veld, that sometime after Mr. Calvo completed his 500-

14   hour drug program and maybe, maybe, but not inexorably

15   was finished with his supervised release, he turned

16   right back to drug dealing, and this informant's

17   information to the DEA substantiates that.  That's how

18   he got by.  And it causes me to scratch my head because

19   here's a guy who had a good job, he is married to

20   somebody who's able-bodied and presumably could work

21   too.  He has two children.  But that's not unlike many

22   people on this island who go to work every day, and

23   work hard at legitimate jobs.  They don't -- they

24   contribute to the betterment of life on this island

25   rather than to the detriment of it, as Mr. Calvo did.

1    I wonder if he thought about the implications

2  of what he was doing.  Not addicted to drugs, doing

3  this just for fast and easy money, but turning out

4  these little bits of drugs that would feed others'

5  addictions and lead to so many problems for so many

6  other people.  The implications of that, Mr. Calvo,

7  are just terrible, they're terrible.  Anybody with a

8  conscience would feel guilty about being involved in

9  that activity.

10    And so I have considered the history and

11  characteristics of the defendant, I've considered I

12  think fairly the context of this entire crime.  I

13  believe that the government's recommendation is fair

14  and reasonable.  It's a harsh penalty to be sure, it's

15  a harsh penalty, but you're a young man, you're 30

16  years old, a 15-year sentence is going to result in

17  about a 12-and-a-half-year actual time in custody.

18  You'll be 42 when you come out, your children will

19  still be here I assume, your significant other will

20  still be here, you can get your life in order.

21    I hope you mean what you say today in your

22  acknowledgment, Mr. Calvo, because you've hit the nail

23  on the head; if you come back another time, there's not

24  going to be a third chance for you.  I don't suspect

25  that Congress is going to change the drug laws such

1    You're to submit to the collection of a DNA sample by

2    the U. S. Probation officer.   Comply with the standard

3    conditions of supervised release that are set forth

4    under 3583, and will be provided to you in written

5    form.

6            Don't possess firearms or dangerous weapons.

7    Don't use alcohol.   Participate in a program for

8    substance abuse, which may include drug testing.

9            And the Court finds, in light of the sentence

10   pronounced, that the requirement of a hundred hours

11   community service is not necessary.   I do not impose

12   that.

13           I find that Mr. Calvo is not in a position to

14   pay a fine, so I do not impose a fine.   I do impose a

15   hundred dollar penalty assessment, which I find that he

16   can pay during the course of his incarceration.   I note

17   that he previously worked in prison industries and made

18   money; he can do that again and pay this fine off as

19   soon as possible.

20           All right, that's the judgment of the court.

21           Mr. Calvo, I understand that the first plea

22   agreement had a waiver of appeal, the second did not,

23   the modified agreement did not.

24           Is that right, Ms. Johnson?   He's entitled to

25   appeal the sentence imposed by the Court?

Wanda M. Miles
Official Court Reporter
District Court of Guam

1         MS. JOHNSON: Yes.

2         THE COURT: You have a right to appeal the

3 sentence and judgment of the court. Your notice of

4 appeal has to be filed within ten days. Mr. Van de

5 Veld will help you file a notice of appeal, if that's

6 what you choose to do, or the clerk may assist you with

7 that.

8         You must pay a filing fee to file the appeal

9 unless you file an application showing that you're

10 indigent, in which is case you'll be allowed to file a

11 free appeal.

12         All right. The defendant is remanded at this

13 time.

14         MR. VAN DE VELD: Your Honor, we request

15 judicial recommendation to a facility on the West

16 Coast, whether it be Lompoc or Sheridan, Oregon.

17         THE COURT: All right, I'll make that

18 recommendation that Mr. Calvo be sentenced to a federal

19 prison on the West Coast.

20         MR. VAN DE VELD: Your Honor, is it possible

21 -- he has been at liberty since the time of his arrest;

22 is it possible that he remain at liberty until a

23 facility is designated?

24         THE COURT: No, I'm against that, Mr. Van de

25 Veld, I don't routinely do that. Today is the day of

1   judgment.  This has been a long-standing day, he was

2   ready psychologically, I think he should have had his

3   affairs in order, and today is the day for him to begin

4   serving his sentence.  So he's remanded at this time.

5              (Whereupon proceedings concluded.)

6                          * * *

7

8

9

10                   CERTIFICATE OF REPORTER

11

12   CITY OF AGANA         )
                           ) ss.
13   TERRITORY OF GUAM     )

14

15              I, Wanda M. Miles, Official Court Reporter

16   of the District Court of Guam, do hereby certify the

17   foregoing pages 1-61, inclusive, to be a true and

18   correct transcript of the shorthand notes taken by me

19   of the within-entitled proceedings, at the date and

20   time therein set forth.

21              Dated this 29th day of March, 2006.

22

23              *Wanda M. Miles*

24

25